Appeal of Chartiers Valley School District etc. Chartiers Valley School District and Township of Scott, Appellants.

Appeal of Chartiers Valley School District etc. Connecticut General Life Insurance Company, Appellant.

Appeal of Chartiers Valley School District etc. R. Gordon Mathews and Jack L. Friedlander et al., Appellants.

Appeal of Chartiers Valley School District etc. Jack L. Friedlander et al., Appellants.

Appeal of Chartiers Valley School District etc. R. Gordon Mathews et al., Appellants.

Argued October 7, 1981, before President Judge CRUMLISH and Judges ROGERS and BLATT, sitting as a panel of three.

*Thomas J. Dempsey*, with him *William J. Fahey, John Silvestri* and *William J. Bresnahan*, for appellant/ appellee, Chartiers Valley School District and Township of Scott.

*Leonard M. Mendelson*, with him *Maira Barnette, Hollinshead and Mendelson*, for appellants/appellees, R. Gordon Mathews, Jack L. Friedlander et al. and Connecticut General Life Insurance Company.

OPINION BY PRESIDENT JUDGE CRUMLISH, JR., June 9, 1982:

This is a consolidation of 14 appeals from seven Allegheny County Common Pleas Court orders affecting real estate tax assessments. We affirm.

The taxpayers,[1] owners of a Scott Township apartment complex,[2] contested their properties' assessments for various years and triennials.[3] The County Board of Property Assessment, Appeals and Review[4] (Board) responded:

| Parcel No. | Years in Question | Reduction of Assessed Value From | To |
|---|---|---|---|
| 64-B-190 | 1976, 1977, 1978 | $1,362,400 | $1,100,000 |
| 64-G-2 | 1976, 1977, 1978 | $1,376,100 | $1,200,000 |
| 64-L-300 | 1976, 1977, 1978 | remained at $62,300 | |
| 64-G-50 | 1969 | $1,778,650 | $1,450,000 |
| 64-G-50 | 1970, 1971, 1972 | $1,778,650 | $1,450,000 |
| 64-G-50 | 1973, 1974, 1975 | $1,778,580 | $1,600,000 |
| 64-G-50 | 1976, 1977, 1978 | $1,778,580 | $1,600,000 |

Both the taxpayers and the taxing authorities[5] appealed the Board's determination to common pleas

---

[1] The taxpayers include General Life Insurance Company, R. Gordon Mathews, Jack Friedlander and unnamed "others."

[2] The property at issue consists of four contiguous parcels, each differently titled and separately assessed, which form an integrated apartment complex designated "Catham Park Apartments." The complex contains more than 1,100 units in a variety of structures: highrise and garden apartments, and two-and three-bedroom townhouse units.

[3] With respect to all four parcels, the appeals encompass the years 1976, 1977 and 1978 and include 1979 by virtue of the Continuation Statute, Act of July 8, 1969, P.L. 126, as amended, 72 P.S. §5452.11 (which provides that, as long as an appeal from an assessment is pending, the appeal will also be taken as an appeal by the taxpayer on the subject property for any valuation for any triennial or inter-triennial assessment subsequent to the filing of such appeal and prior to the appeal's determination). In addition, with respect to one of the parcels, assessments for the years 1969 through 1975 are at issue as well.

[4] In Allegheny County, the Board of Property Assessment, Appeals and Review is responsible for revising and reviewing real estate tax assessments. Section 1 of the Second Class County Assessment Law, Act of June 21, 1939, P.L. 626, as amended, 72 P.S. §5452.1.

[5] The Chartiers Valley School District and the Township of Scott are the taxing authorities.

court. Allegheny County intervened for the taxing authorities. The taxpayers contested the prevailing ratio of assessment to fair market value applied to their properties.[6] The taxing bodies, on the other hand, requested the court below to increase the assessed values in all cases. The trial court made specific findings regarding the parcels' respective market values for the years in question and determined the assessments by applying the Board-established 50 percent ratio, and entered the following decisions:

| Parcel No. | Years in Question | Trial Court's Decision Regarding Assessments |
|---|---|---|
| 64-B-190 | 1976, 1977, 1978 | Increased from $1,100,000 to $1,174,700 |
| 64-G-2 | 1976, 1977, 1978 | Increased from $1,200,000 to $1,250,150 |
| 64-L-300 | 1976, 1977, 1978 | Remained at $62,300 |
| 64-G-50 | 1969 | Remained at $1,450,000 |
| 64-G-50 | 1970, 1971, 1972 | Remained at $1,450,000 |
| 64-G-50 | 1973, 1974, 1975 | Remained at $1,600,000 |
| 64-G-50 | 1976, 1977, 1978 | Increased from $1,600,000 to $1,650,830 |

The taxpayers appeal these decisions to this Court and the taxing authorities cross-appeal.

We must resolve two issues: *first,* whether the court below erred in law or abused its discretion in calculating the parcels' respective fair market valuations; and *second,* whether the taxpayers had produced competent evidence rebutting the uniformity of the Board-established 50 percent assessment to market value ratio. We are mindful of our limited scope of review in these cases: the findings of the court below must be given great force and will not be disturbed unless clear error appears. *New Castle Cen-*

---

[6] The Board, by unanimous motion, set the ratio of assessed value of real estate in the county to the fair market value of real estate in the county at fifty percent (50%).

*tral Renewal Associates' Appeal,* 36 Pa. Commonwealth Ct. 584, 586, 389 A.2d 225, 228 (1978).

The procedure followed in real estate assessment cases has been delineated by our Supreme Court in *Deitch Co. v. Board of Property Assessment,* 417 Pa. 213, 209 A.2d 397 (1965). The court initially decides, on the basis of competent, credible and relevant evidence, the property's fair market value. The court next applies the appropriate assessed value to market value ratio which exists in the taxing district to the property's market value to arrive at a proper assessment.

## I

Our initial focus is on the correctness of the parcels' judicially endorsed fair market valuations. A fair market value[7] determination is not controlled by any single factor, *Appeal of Park Drive Manor, Inc.,* 380 Pa. 134, 136, 110 A.2d 392, 394 (1955), and where the trial court had the opportunity to weigh the evidence firsthand, we will not disturb its decision absent proof of abuse of discretion, lack of supporting evidence or clear error of law. *See Appeal of Scott Township,* 31 Pa. Commonwealth Ct. 505, 377 A.2d 826 (1977).

At the hearing, John Kulzer testified for the taxpayers, and John K. Ellis on the taxing bodies' behalf.[8] Both experts relied to varying degrees on the

---

[7] "Fair market value" for real estate tax assessment purposes is "the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied." *Buhl Foundation v. Board of Property Assessment, Appeals and Review,* 407 Pa. 567, 570, 180 A.2d 900, 902 (1962).

[8] Leo B. Shapero also testified for the taxing authorities as to the valuation of parcel 64-L-300. The greater amount of testimony supporting the authorities' case, however, was proffered by Ellis.

"income analysis approach"[9] and "market data approach"[10] in appraising the properties' values. In addition, Ellis also employed the "reproduction cost approach"[11] for the declared limited purpose of verifying his overall valuation opinions. An exhaustive analysis, however, of the record reveals glaring weaknesses in Ellis' testimony. For example, Ellis, in employing the "income analysis" valuation method, significantly altered the properties' actual expense items.[12] Furthermore, there are numerous dissimi-

---

[9] Basically, this technique calculates the value of income-producing property by capitalizing the property's annual net income. Net income, which is a principal component in the calculation, is derived by deducting the property's actual annual expenses from the year's gross income.

[10] Under this method, the valuation is estimated by comparing the subject property to similar properties in the proximate area which were recently sold. *Recent* sales of *comparable* properties in the proximate area are persuasive in establishing market value. *See Deitch, Inc.* at 222, 209 A.2d at 402.

[11] Under this technique, the upper limits of an improved property's value is related to the cost of reconstructing, or reproducing, the improvement, minus depreciation.

The "reproduction cost approach" is not a recognized method of establishing market value in tax assessment cases. The results produced by applying this technique cannot be relied upon in court, *even for the limited purpose of verifying estimates derived through the utilization of other methods* since, under the well-entranched law, "reproduction cost has no probative value *for any purpose* in fixing the fair market value of improved real estate for tax purposes." *U.S. Steel Corp. v. Board of Assessment and Revision of Taxes*, 422 Pa. 463, 467, 223 A.2d 92, 94 (1966). (Emphasis added.)

[12] Any reported expense item which, in Ellis' opinion, represented a percentage of gross income disproportionately higher than the "normal range" for that expense (based on his personal observations of other apartment complexes and on a published study by the National Institute of Real Estate Management), was significantly altered, which, in turn, produced a larger net income figure for the years in question, ultimately increasing the fair market valuation of the property.

larities in the "comparables" utilized by Ellis in his "market data" analysis.[13] In addition, Ellis, although admittedly relying on both the income analysis and market data techniques, was unable to ascribe the respective weight given to each in his final analysis.

The trial court must decide on the basis of *competent, credible* and *relevant* evidence, the properties' fair market value. *Deitch Co.* at 224, 209 A.2d at 403. Faced with conflicting expert testimony, the trial court determines the weight of each.[14] *See Marx v.*

---

[13] For example, in estimating the valuation of Parcel No. 64-G-50 for 1969, Ellis introduced the sales of four other apartment complexes to compare with the subject property. One such "sale" involved a transfer of stock rather than a deed conveyance of real property, and we note that the purchase price of a property normally would be affected by the dissimilar natures of these respective transactions. The second sale involved a complex located in a separate geographical area of the county and which contained a different "type" of apartment structure (i.e., garden-type apartments as opposed to a combination of highrise, garden and townhouse units found in Catham Park Apartments). The third sale involved a complex nearly 20 years *older* than the subject property and which did not contain the same variety of apartment structures. The fourth sale involved a complex containing approximately 80% fewer units than the subject property.

We fully recognize that the properties compared need not be *identical* in order for the results of the "market data approach" to pass judicial scrutiny. *See Deitch Co.* at 223, 209 A.2d at 402. We also realize that the aim of this method is to demonstrate values by focusing on characteristic qualities, *whether similar or divergent*. *Id.* However, our review of the record indicates that the taxing bodies' witness, Ellis, had failed to sufficiently develop his analysis to the point where the trial court was required to accord his testimony overriding weight; hence, we can find no clear error by the Judge below.

[14] We have not here detailed *all* of the testimony proffered on *each* subject property for *each* year in question. We have discussed various aspects of Ellis' testimony in order to address the taxing bodies' claim that the court below erred by failing to give

*Board of Property Assessment, Appeals and Review,*
31 Pa. Commonwealth Ct. 496, 377 A.2d 199 (1977).
In this case, the common pleas court, confronted with
sharply contrasting valuations,[15] weighed the evidence
and calculated the parcels' respective valuations.[16]
There being no discretion abuse, paucity of support-
ing evidence or legal error, we sustain the trial court's
fair market valuations.[17]

---

their expert's valuation testimony overriding weight. Having re-
viewed thoroughly the record, we conclude that, given the weak-
nesses of Ellis' testimony, the lower court acted well within its
discretion by refusing to accord exclusive and overriding weight
to the taxing bodies' evidence of the properties' valuations.

[15] The following displays the respective experts' opinions re-
garding the parcels' fair market valuations for the disputed years:

| Parcel No. | Years in Question | Ellis | Kulzer |
|---|---|---|---|
| 64-B-190 | 1976, 1977, 1978 | $2,750,000 | $2,000,000 |
| 64-G-2 | 1976, 1977, 1978 | $2,800,000 | $2,000,000 |
| 64-L-300 | 1976, 1977, 1978 | $ 400,000 | $ 100,000 |
| 64-G-50 | 1969 | $3,600,000 | $2,800,000 |
| 64-G-50 | 1970, 1971, 1972 | $3,600,000 | $2,800,000 |
| 64-G-50 | 1973, 1974, 1975 | $3,800,000 | $2,500,000 |
| 64-G-50 | 1976, 1977, 1978 | $3,800,000 | $2,800,000 |

[16] The common pleas court made the following fair market
valuations:

| Parcel No. | Years in Question | Fair Market Valuations Determined by Trial Court |
|---|---|---|
| 64-B-190 | 1976, 1977, 1978 | $2,349,400 |
| 64-G-2 | 1976, 1977, 1978 | $2,500,300 |
| 64-L-300 | 1976, 1977, 1978 | $ 124,600 |
| 64-G-50 | 1969 | $2,900,000 |
| 64-G-50 | 1970, 1971, 1972 | $2,900,000 |
| 64-G-50 | 1973, 1974, 1975 | $3,200,000 |
| 64-G-50 | 1976, 1977, 1978 | $3,301,660 |

The fifty percent assessed value to market value ratio then was
applied to these valuation figures to arrive at a final assessment
figure.

[17] The trial court's market value determinations indicate that,
although generally viewing the taxpayers' valuation evidence more

## II

We now decide whether the predetermined 50 percent assessment to market value ratio is uniform. It is constitutionally embodied[18] that a taxpayer should pay no more than his fair share of the cost of government, *see Deitch Co.* at 220, 209 A.2d at 401; hence, the assessment of the taxpayer's property must conform with the taxing district's common level of assessment. Regardless of the purported (or, in this case, the predetermined) assessment to market value ratio, where the taxpayer shows that other properties are assessed at less than the officially-proclaimed ratio, he is entitled to a reduced assessment which reflects the ratio *actually* applied to other properties. *See Appeal of Mt. Lebanon* at 510, 416 A.2d at 601.

In tax assessment cases, the assessment is prima facie valid where the taxing body presents the assessment record into evidence. *See McKnight Shopping Center, Inc. v. Board of Property Assessment,* 417 Pa. 234, 237, 209 A.2d at 389, 391 (1965). The taxpayer then must respond with credible, relevant evidence in order to rebut successfully. *See Deitch Co.* at 221, 209 A.2d at 402. In this case, the taxpayers contend that the trial court erred twice: *first,* by accepting the predetermined assessment to market value ratio in light of allegedly uncontradicted evidence demonstrating a lower ratio; and *second,* by exclud-

---

favorably, the lower court did not give prevailing effect to such testimony. Although the common pleas court appears to have favored Kulzer's testimony in three of its verdicts, the remaining valuations fell between the estimates presented by the representative experts.

[18] Pennsylvania Constitution Article VII, §1 provides that "[a]ll taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws."

ing from evidence the results of certain computer studies which allegedly demonstrate a lower assessment to market value ratio by comparing sales prices for properties in the county to tax assessments of those same properties.

As to the first claim, Dr. Charles Blocksidge, Director of Assessments for Allegheny County, as the taxpayers' primary witness, identified two memoranda which he had prepared based on data compiled by the County Computer Department. The first memorandum contained a sales assessment ratio study generated by a method known as the Pennsylvania Assessments Uniform Program, or "PAUP," technique.[19] The report was introduced to demonstrate the relationship between the sales prices of real property in the county between 1974 and 1976, inclusive, and the 1978 assessments of these properties.[20] The second memorandum compared 1978 assessments to real property sales throughout the county for the years 1974 through 1977, inclusive.

Under cross-examination, Blocksidge admitted that the Board had not authorized these studies; that he was not responsible for assimilating the data, nor did he know who was responsible; that he had no personal knowledge of the data collection process; that he was not the computer records' official custodian; and that he did not supervise the sampling of the

---

[19] The PAUP technique is a computer program developed at the Pennsylvania State University for doing statistical analysis.

[20] In resolving whether or not the application of the assessment to market value ratio complies with the constitutional requirement of uniformity, the taxpayer can produce evidence regarding the ratios of assessed values to market values as market values are reflected in actual sales of any other real estate in the taxing district for a reasonable period prior to the assessment date. *Deitch Co.* at 223, 209 A.2d at 403.

computer records.[21] The witness also testified that, without further refinement,[22] these memoranda would have very limited value in calculating the exact assessment to market value ratio within the county for the period in question. Although admitting these memoranda into evidence, the court below noted their limited reliability.

We conclude that the common pleas court exercised properly its discretion by not assigning great weight to Blocksidge's testimony.[23]

The taxpayers' second contention relates to the exclusion from evidence of the results of county-sponsored computer studies allegedly indicating the ratio of sales prices to assessments of properties throughout the taxing district. The taxpayers called John Saunders, the County Director of Computer Services, but he had no personal knowledge of the compiled data nor was he acquainted with the meaning of the studies' terminology. Rudy Bizon, a County Department of Computer Services supervisor, also testified for the taxpayers, but he did not participate

---

[21] In addition, Blocksidge was unable to vouch for the trustworthiness of the computer operator or reliability of the source of information fed into the computer, nor was he familiar with the procedures utilized in programming the computer for these studies.

[22] Blocksidge indicated that a change in the assessment ratio based upon a sales analysis would require "our personnel to review the sale on a sale-by-sale basis and also to further categorize and classify [the sales] according to different types of properties. . . . We would also apply some more statistical tests to the ratios to make certain that they are, in fact, representative of the various political jurisdictions . . ." in the county.

[23] Two other witnesses called by the taxpayers could not support the challenge to the 50% ratio. The first witness, John Scanlon, was excused by the court since he had no relevant knowledge regarding the matters involved. The other witness, John Kulzer (also called as a valuation witness), was disqualified from giving a ratio opinion because he had not specifically studied the issue.

in the studies' programming and could not vouch for the competence of the individuals who had compiled the data or who had fed the information into the computer. Finally, Fred J. LaPointe, Jr., who had been employed previously by the County's Department of Computer Services, testified that, in designing the computer studies, certain minimum and maximum sales price limits were established, which resulted in the exclusion of a large number of actual sales from the studies.[24] LaPointe also indicated that the data used in the contested analyses were developed as part of a process for reviewing various assessment programs offered by several vendors of computer systems. The data were collected and used *primarily* to evaluate and compare the various computer programs, and only *incidentally* to prepare an examination of the assessment to market value ratio for properties in the county.[25]

We conclude that the common pleas court properly excluded the computer studies from consideration. Although admittedly any competent evidence of the overall current ratio based on sales within a taxing district may be introduced, *see Appeal of Mt. Lebanon* at 511, 416 A.2d at 602, we concur with the trial court that these studies lack the requisite competency and credibility. None of the taxpayers' witnesses was

[24] To illustrate, in one aspect of the study, 804 of 2,101 (over 38%) sales transactions were excluded from the analysis as falling outside the predetermined range limits. In another instance, 740 of 3,578 (over 20%) of the transactions were excluded from consideration as falling beyond the established bounds.

[25] In addition, there was no procedure for verifying the accuracy of the raw data supplied by the County Deed Registry Office for the computer studies. The information programmed into the computer was not checked by the Department of Computer Services, nor was there any indication in the record that the Deed Registry Office verified it.

personally familiar with the subject data, nor could they vouch for the accuracy of the information compiled or the trustworthiness of the individuals responsible for programming the data into the computer. Furthermore, these studies excluded a large number of actual real estate sales transactions in the county.[26]

The taxpayers' contention that these studies should have been admitted into evidence under the purview of the Uniform Business Records Act[27] (Act) is meritless. Since the study was undertaken *primarily* as a developmental model for judging competing computer program proposals and *not* for the compilation of data to be used by the county for any of its normal governmental functions, we conclude that it was not made in the "regular course of business" as required by the Act. Further, the Act gives the tribunal the discretion to determine whether or not the "sources of information, method and time of preparation were such as to justify its admission." We have held that:

> The Act does not make all business records competent regardless of the manner in which and the purpose for which they were compiled. Rather, the Act imposes specific requirements

[26] Although a taxpayer need not produce evidence regarding *every recent sale* in the taxing district, *Dietch Co.* at 223, 209 A.2d at 403, he must produce a number of sales sufficient to give credence to his contention. Our review of the record indicates that such a large percentage of sales was excluded from consideration as to deprive the studies of their evidential significance.

[27] 42 Pa. C. S. §6108(b) provides:

A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission.

which must be met if the evidence in question is to be admitted. (Citation omitted.) *Ceja v. Unemployment Compensation Board of Review,* 41 Pa. Commonwealth Ct. 487, 489, 399 A.2d 807, 808, *aff'd,* 493 Pa. 588, 427 A.2d 631 (1981). Testimony can be disregarded by the tribunal if, in the exercise of its discretion, it finds the offer to be incompetent or incredible. *McKnight Shopping Center, Inc.* at 240, 209 A.2d at 392 . We agree that the studies' informational source and preparation method lack the very basic, yet paramount, requisite that evidence be credible and legally sufficient to be admitted, and conclude that these studies were excluded properly.[28]

The taxpayers' final contention is that the trial court erred by excluding *all* deed books for the subject years and *all* assessments for the same years as evidence of the prevailing assessment to market value ratio.[29] The taxpayers argue that these documents provide the court with all the necessary information for establishing the prevailing assessment to market value ratio, which the court could then calculate

[28] The taxpayers mistakenly rely on *Appeal of Mass. Mut. Life Ins. Co.,* 426 Pa. 566, 235 A.2d 790 (1967), to support their argument that the computer studies should have been admitted into evidence. In *Mass. Mut.,* the taxpayers had introduced the testimony of an economist who personally had made a thorough study of sales occurring in the county. The witness clearly defined the parameters of his comprehensive study and rendered an opinion based on his findings, as to the existing ratio. In this case, however, the taxpayers have attempted to introduce computer studies through witnesses who were not even familiar with the terminology employed in the program, and who could not vouch for the validity of the data or the reliability of the input process. Hence, *Mass. Mut.* is clearly not controlling.

[29] The taxpayers offered into evidence *all* deed books and assessment books for Allegheny County covering the period from 1968 to 1978, inclusive.

"by the use of simple mathematics." The evidence was excluded as placing an undue burden on the court below. The record indicates that the *assessment books alone* comprise nearly 3,300 volumes which, by estimate, weigh four and two-thirds tons and would occupy one thousand cubic feet! We agree that the mere offering of these documents into evidence is *not* an acceptable method of proving the assessed value to market value ratio. To hold otherwise would place an unnecessary burden on an already over-taxed judiciary.[30] There being no duty imposed on the trial court to undertake this monstrous task,[31] we conclude that the exclusion of these documents from evidence was proper. Since the taxpayers failed to respond with credible, relevant and competent evidence refuting the uniformity of the predetermined ratio, the taxing bodies prevail. *See Deitch Co.* at 221, 209 A.2d 402. Having failed to sustain their burden, the taxpayers cannot expect the trial (nor our Court on appeal) to prove their allegations.

Affirmed.

ORDER

The Allegheny County Common Pleas Court orders, Nos. G.D. 78-3833, G.D. 78-3834, G.D. 78-3835, G.D. 78-3836, G.D. 78-22089, G.D. 78-22090, and G.D. 78-22091, all entered April 25, 1980, are hereby affirmed.

---

[30] We note from the record that, although the trial judge provided the taxpayers with the opportunity to retain a statistician to perform this extensive task and to hereafter report on the results, the taxpayers apparently have elected not to do so.

[31] The taxpayers misplace reliance on *Appeal of Cabot 95 Trust*, 27 Pa. Commonwealth Ct. 214, 365 A.2d 1332 (1976), to support their contention that, burdensome as it unfortunately may be, the trial court is under a duty to calculate the actual prevailing ratio used generally in the county. In *Cabot*, our ruling, which

Judges MENCER and PALLADINO did not participate in the decision in this case.

---

clarified the hearing judge's duty to determine the rato used generally in the subject taxing district, was based on Section 704 of the Fourth to Eighth Class County Assessment Law, Act of May 21, 1943, P.L. 571, *as amended*, 72 P.S. §5453.704, which explicitly requires the hearing court to:

> [*M*]*ake such orders* and decrees *determining from the evidence submitted at the hearing what ratio was used generally in the taxing district* and the court shall direct the application of the ratio so found to the value of the property which is the subject matter of the appeal. . . . (Emphasis added.)

This case, however, is controlled by Section 12 of the Second Class County Assessment Law, Act of June 21, 1939, P.L. 626, *as amended*, 72 P.S. §5452.12, which imposed on the hearing court the duty to:

> [*H*]*ear* and determine said appeal, and, *if necessary, to make such changes in the assessment as may be right and proper.* . . . (Emphasis added.)

Clearly, the trial court is not responsible for wading through this paper morass and calculating, *sua sponte*, the assessment to market value ratio for Allegheny County, a second class county. We surmise that the different duties imposed on the trial courts by 72 P.S. §5453.704 and 72 P.S. §5452.1, respectively, are attributable to the counties' different sizes.