**CITY OF HARRISBURG, Appellant,**

v.

**DAUPHIN COUNTY BOARD OF ASSESSMENT APPEALS and Thornwood Holding Corporation.**

Commonwealth Court of Pennsylvania.

Argued April 15, 1996.
Decided May 17, 1996.

PELLEGRINI, Judge.

The City of Harrisburg (City) appeals the order of the Court of Common Pleas of Dauphin County (trial court) determining that property owned by Thornwood Holding Corporation (Taxpayer) had a fair market value for the tax year 1994 of $1,042,793.[1]

Taxpayer owns an apartment complex in Harrisburg called Thornwood Commons Apartments. On approximately four acres, the complex contains 114 apartment units, mostly one-bedroom apartments with some two-bedroom apartments, in five three-floor buildings. The property was reassessed in 1994 at $1,476,800, based on a market value of $2,234,190.[2] On appeal, the Dauphin County Board of Assessment Appeals reduced the market value to $1,368,000, resulting in an assessment of $904,200. The City appealed to the trial court and Thornwood intervened.

After the assessment record and the Board of Assessment Appeal's decision were introduced, expert evidence on fair market value was introduced by the City and, in rebuttal, by the Taxpayer. Laurence Hirsch, a certified general appraiser, testified for the City (City's expert) that under both the sales comparison approach and the income approach, the value of the property was $1.5 million. In computing market value under the income approach, he first determined potential gross rental income based on economic rent for such a property in that area and assuming deferred maintenance was completed. He then determined that an appropriate vacancy rate for the apartments, again assuming needed repairs were done, was 10%.[3] Under

Judith B. Schimmel, City Solicitor, for Appellant.

Anthony R. Thompson, for Appellee, Thornwood Holding Corporation.

Before PELLEGRINI and FLAHERTY, JJ., and SILVESTRI, Senior Judge.

1. The Dauphin County Board of Assessment Appeals did not participate in this appeal.

2. All parties agree that the appropriate common level ratio is 66.1%.

3. The City's expert's calculation of valuation under the income approach was:

| | | |
|---|---|---|
| potential gross rental income | | $ 583,560 |
| vacancy rate 10% | − $ | 58,356 |
| ancillary income | + $ | 4,000 |
| effective gross income | | $ 529,204 |
| total expenses | − $ | 261,344 |
| net operating income | | $ 267,860 |

the cost approach, which he considered speculative for valuing a rental property such as this one, the City's expert found the value to be $2 million. Overall, he gave more weight to the income approach and opined that the fair market value of Taxpayer's property was $1.5 million.

Testifying for Taxpayer, William Daylor, also a certified general appraiser, (Taxpayer's expert) reached a final fair market value for the property at $950,000. He stated that under the sales comparison approach, the value was $965,000, and under the income approach, it was $925,000. In calculating market value under the income approach, like the City's expert, he determined the potential gross rental income based on economic rent and assuming deferred maintenance was completed. He then determined that an appropriate vacancy rate, in those circumstances, was 15%.[4] Taxpayer's expert did not do a cost approach because he considered it to be inappropriate due to the age of

the property and its extensive depreciation and obsolescence, but considering the values under comparable sales and income approaches together, he opined that the fair market value of the property was $950,000.

■ The trial court found that the income approach was the most appropriate method of valuation for this property. Within that approach, it found that the capitalization rate should be 12.96% as used by the City's expert in his expert valuation. The trial court found that Taxpayer's expert used a vacancy rate of 15% and the City's expert used a vacancy rate of 10%, and that the appropriate rate is 10%, which is an average rate for similar properties in the same general area. Stating that expenses should be based on the Taxpayer's figures, the trial court found that the City's expert improperly estimated expenses for only the nine-month period of Taxpayer's ownership rather than estimating the expenses for a year. Making its own calculation,[5] the trial court found a market

| | | |
|---|---|---|
| capitalization rate | ÷ | .1296 |
| | | $ 2,066,820 |
| deferred maintenance | − | $ 570,000 |
| VALUE | | $ 1,496,821 |

(Reproduced Record 188a). He defined effective gross income as potential rental income less vacancy and collection losses. (R.R. 165a, 166a).

4. Taxpayer's expert's calculation under the income approach was:

| | | |
|---|---|---|
| potential gross rental income | | $ 595,080 |
| vacancy rate 15% | − | $ 89,262 |
| ancillary income | + | $ 3,600 |
| effective gross income | | $ 509,418 |
| total expenses | − | $ 300,400 |
| net operating income | | $ 209,018 |
| capitalization rate | ÷ | .1400 |
| | | $ 1,492,985 |
| deferred maintenance | − | $ 570,000 |
| VALUE | | $ 925,985 |

(R.R. 282a, 285a). His 15% vacancy rate included collection losses. (R.R. 282a).

5. The trial court attached its calculation to the opinion:

| | | |
|---|---|---|
| net operating income (Daylor's) | | $ 209,018 |
| capitalization rate | ÷ | .1296 |
| | | $ 1,612,793 |

value of $1,042,793, with a corresponding tax assessment of $689,286.[6] The City then filed this appeal.[7]

■ The proceedings concerning a tax assessment case are heard *de novo* before the trial court. The trial court must decide the property's fair market value on the basis of competent, credible and relevant evidence. *Deitch Company v. Board of Property Assessment*, 417 Pa. 213, 209 A.2d 397 (1965). The weight to be given to conflicting evidence is for the trial court to determine. *Id.* at 221–222, 209 A.2d at 402.

The City contends that the trial court's finding that its expert only calculated expenses for nine months is not supported by the evidence because the City's expert testified that although he considered Taxpayer's report of actual expenses for its nine months of ownership in 1995, he also considered other sources in projecting annual expenses, including an expense analysis published by the Institute of Real Estate Management. (R.R. 377a, 179a). Taxpayer argues that the City's expert's expense figure is "suspiciously close" to the Taxpayer's report of actual expenses for April 1995 through December 1995, and that trial court could have inferred that the City's expert underestimated expenses. (Taxpayer's brief, p. 8). The trial court's finding, however, was not that the City's expert underestimated expenses, but that the City's expert calculated expenses *only for the nine-month period of present ownership.* (op. p. ——). There is no evidence in the record to support this finding.

■ The City's expert's report on the income approach purports to calculate all factors on an annual basis, including the esti-

mate of annual operating expenses, assuming the deferred maintenance was completed. In doing the estimate, the City's expert stated that he considered that, in his experience, expenses normally range from 25% for newer properties to 45% for older properties, and that based on the age, recent poor management, construction and design of the property, expenses would be expected to be at the high end. (R.R. 179a). He proceeded to estimate each item of expenses based on the formal estimates given in the Institute of Real Estate Management's Income and Expenses Analysis for apartments and considering historical expenses from the Taxpayer's year-end report. (R.R. 179a–181a). Based on the estimate of each item, he reached a total operating expense estimate of $261,344, which is 44.8% of potential gross rental income. On cross-examination, the City's expert was repeatedly questioned about the effect of the Taxpayer's actual year-end expense report. When asked if it was coincidental that his estimate of expenses was close to actual expenses, the City's expert stated that "I would say that it's probably coincidental as well as the fact that we utilized some of the information that was provided to us." (R.R. 376a). When also asked to what extent he relied on the actual expenses, he stated "I guess the best way to answer that is that we utilized them, but the most important element ... was that many item expenses represent typical and proper management of the subject property assuming that it was renovated." (R.R. 377a). The City's expert was never asked if he estimated expenses for a year or for nine-months, and Taxpayer's expert did not make any suggestion to that effect, only that the

| deferred maintenance | − $ | 570,000 |
| VALUE | $ | 1,042,793 |
| common level ratio | × | .661 |
| TAX ASSESSMENT | $ | 689,286 |

(Slip op. at 7).

6. The City filed a motion for reconsideration with the trial court raising all of the issues raised here, but it was summarily denied.

7. Our scope of review in a tax assessment appeal, where the trial court had the opportunity to weigh the evidence firsthand, is limited; we will not disturb the trial court's decision absent proof

of abuse of discretion, lack of substantial supporting evidence for its findings or clear error of law. *Appeal of Chartiers Valley School District*, 67 Pa.Cmwlth. 121, 447 A.2d 317 (1982), *appeal dismissed*, 500 Pa. 341, 456 A.2d 986 (1983).

City's expert's estimate was too low because, he opined, expenses should rise if the renovations are completed because more apartments are rented. (R.R. 470a). There was no evidence to support a finding that the City's expert estimated operating expenses for only the nine-month period of current ownership, when the expert asserted that he estimated annual expenses after renovations and there was no evidence to the contrary.[8]

■ The City also contends that although the trial court found that a vacancy rate of 10% rather than 15% must be used, it then adopted the net operating income figure used by Taxpayer's expert even though he applied a vacancy rate of 15%. It asserts that the trial court should have calculated its own figure for net operating income by utilizing a 10% vacancy rate. Taxpayer counters that its expert used a combined "vacancy and credit loss rate" of 15%, and that the trial court only determined that the vacancy rate should be 10%.[9]

The trial court opinion specifically states that one difference between the two expert witnesses' determinations of fair market value is that Taxpayer's expert used a vacancy rate of 15%, while the City's expert used 10%. (Op. p. 738). Then, in the findings of fact, the trial court stated:

7. A vacancy rate of 10% will be used in calculating market value. A comparison of similar properties in the same general vicinity as Thornwood Commons shows vacancy rates in the area range from 7% to 15%. Therefore, 10% is considered an average rate for the property.

8. The City also argues that the expense figure used by Taxpayer's expert did not project expenses but merely annualized current expenses. Although there was no finding of fact pertaining to this assertion, Taxpayer's expert testified that he "stabilized" expenses based on current and historical data and on comparisons with other apartments. (R.R. 463a–464a). "Stabilized expenses" are defined as projected expenses that have been adjusted to reflect equivalent, stable annual expenses. American Institute of Real Estate Appraisers, The Dictionary of Real Estate Appraisal, 288 (1984).

9. Vacancy and credit loss or collection loss are deducted from potential gross income to reach an effective gross income. (R.R. 165a–166a).

(Op. p. 739). The trial court next determined the fair market value of the property to be $1,042,793, by utilizing a net operating income of $209,018, and footnotes that the figure was obtained from Taxpayer's expert's appraisal. Taxpayer's expert's calculation utilizes a combined vacancy and credit loss rate of 15% and reaches a net operating income of $209,018. (R.R. 282a). We agree with the City that the trial court's finding that a 10% vacancy rate is appropriate is inconsistent with the calculation performed by the trial court relying on Taxpayer's expert's calculation of net operating income which used a 15% vacancy rate rather than a 10% vacancy rate.

■ Taxpayer's argument that its expert's 15% figure included both vacancy and credit loss is correct; however, that fact does not mean the trial court's finding is consistent with its adoption of Taxpayer's expert's net operating income figure. In this case, both experts used the term "vacancy rate" to include both vacancy and collection losses. (R.R. City's expert 165a–178a, Taxpayer's expert 462a, 480, 490a).[10] Just like Taxpayer's expert's, the City's expert's assessment report states that a percentage of potential rental income is deducted for "vacancy and collection losses". (R.R. 165a–166a). Because the City's expert's 10% vacancy rate included credit loss, and the trial court's findings adopted the City's expert's vacancy rate, we must conclude that the trial court treated the term vacancy rate as inclusive of any credit loss and found that the proper rate for both is 10%. The trial court could have separately addressed a credit loss rate if it did not believe 10% included such a rate,

"Vacancy and collection loss is an allowance for reductions in potential rental income because space is not leased or rents that are due cannot be collected.... The allowance is usually estimated as a percentage of potential gross income. The percentage varies according to the type and characteristics of the physical property, the quality of tenancy, current and projected supply and demand relationship, and general and local economic conditions." American Institute of Real Estate Appraisers, The Appraisal of Real Estate, 361 (8th ed., 1983).

10. *See also* J.D. Eaton, Real Estate Valuation Litigation, 119–122 (1982) (one rate is deducted in the example calculations of capitalized income to account for both vacancy and credit losses).

because both experts agreed that some allowance for credit loss was appropriate and included it in their vacancy rate. Moreover, there is nothing in Taxpayer's expert's report or testimony to indicate how or if he would separate vacancy from credit loss, or that vacancy alone would be 10%, as asserted by Taxpayer.[11] Although we must give the findings of the trial court great force, we will reverse if clear error appears. *Appeal of Chartiers Valley School District*, 447 A.2d at 320. Because the trial court's findings of fact and the determination of market value are contradictory, we believe a remand is appropriate for either further findings addressing the conflict or a new calculation utilizing the 10% vacancy rate.

■ The City lastly contends that deferred maintenance costs[12] should not be deducted from market value because it rewards property owners for permitting property to deteriorate. Taxpayer argues that the City did not object to this deduction before the trial court and did not raise it in its Statement of Matters Complained of on Appeal as required by Rule 1925(b) of the Rules of Appellate Procedure.[13] As argued by Taxpayer, this contention is not raised in any manner in the Statement of Matters Complained of on Appeal, (R.R. 92a–94a), and the trial court did not address the issue in its opinion. Although mentioning an issue of whether deferred maintenance expenses should be deducted in the notice of appeal to the trial court, thereafter, the City failed to raise an objection to the deduction of deferred maintenance before the trial court. In fact, both experts deducted deferred maintenance without any objection or suggestion by the City that it might be inappropriate. (R.R. 188a–189a, 336a). Failure to raise an issue below or in its statement of matters complained of on appeal constitutes a waiver of that issue on appeal. *Lower Paxton Township v. Okonieski*, 153 Pa. Cmwlth. 36, 620 A.2d 602 (1993); *Commonwealth v. Phillips*, 411 Pa. Superior Ct. 329, 601 A.2d 816 (1992), *aff'd per curiam*, 534 Pa. 423, 633 A.2d 604 (1993). Therefore, we need not address this issue.[14]

Because the trial court's finding concerning the City's expert's estimate of operating expenses was not supported by the evidence and because the trial court's calculation of market value contradicts its finding as to the appropriate vacancy rate, we vacate and remand for new findings of fact. While we are compelled to vacate the trial court's opinion, we approve of its detailed findings and calculation which allowed the parties to understand the basis of the valuation and assisted in meaningful judicial review.

### ORDER

AND NOW, this 17th day of May, 1996, the order of the Court of Common Pleas of

11. To the contrary, in Taxpayer's expert's testimony, he agreed with the City's expert's assessment that vacancy rates at similar complexes in the general vicinity ranged from 6% to 12%, but stated that he chose a higher rate due to the third-floor walk-up apartments in Taxpayer's apartment complex that were difficult to rent. (R.R. 481a). He made no assertion that the vacancy rates in the general vicinity, relied on by both experts, did not include a credit loss rate, or that his vacancy rate was within that range and only the addition of the credit loss rate made it higher.

12. Deferred maintenance costs were calculated by Taxpayer's expert to be $570,000, and described as the amount required to put these apartments in suitable condition so they are competitive in the marketplace and described as "cosmetic" maintenance such as carpeting, painting and appliance replacement. (R.R. 482a–483a).

13. Pa.R.A.P. 1925(b) states:

The lower court forthwith [upon receipt of the notice of appeal] may enter an order directing the appellant to file of record in the lower court and serve on the trial judge a concise statement of the matters complained of on the appeal no later than 14 days after entry of such order. A failure to comply with such direction may be considered by the appellate court as a waiver of all objections to the order, ruling or other matter complained of.

14. The City's argument suggests that the equitable doctrine of unclean hands applies to Taxpayer, and that this court can apply the doctrine to Taxpayer *sua sponte*. Assuming we could raise the issue *sua sponte*, we believe application of the doctrine is inappropriate in this case because, as admitted by the City, Taxpayer had only owned the property a few months at the time of the assessment and was not responsible for the deteriorated condition of the apartment buildings. The City also admits through its appraisal evidence that substantial repairs were made by Taxpayer after its purchase.

Dauphin County, dated May 11, 1995, No. 38–S–1995, is vacated and the case remanded in accordance with this opinion.   Jurisdiction relinquished.