**841 ASSOCIATES, Appellant,**

v.

**The BOARD OF REVISION OF TAXES OF CITY AND COUNTY OF PHILADELPHIA, City of Philadelphia, and the School District of Philadelphia.**

Commonwealth Court of Pennsylvania.

Argued Feb. 6, 1996.

Decided April 18, 1996.

---

Michael P. Weinstein, for Appellant.

John D. Christmas, Assistant City Solicitor, for Appellees.

Before PELLEGRINI and FLAHERTY, JJ., and NARICK, Senior Judge.

PELLEGRINI, Judge.[1]

841 Associates (Taxpayer) appeals from an order of the Court of Common Pleas of Philadelphia County (trial court) determining that Taxpayer's property had a fair market value in 1994 of $32.5 million. This case presents a pure legal issue of whether a trial court may, in a de novo review of the fair market value of property in a tax assessment challenge, accept only part of the Taxpayer's expert testimony, but not the valuation, when the taxing authority fails to present rebuttal evidence.

Taxpayer owns a 14–story office building located at 919–841 Chestnut Street in downtown Philadelphia. The building was originally assessed a fair market value of $43.2 million for 1994. On appeal by the Taxpayer, the Board of Revision of Taxes of Philadelphia County (Board) reduced the assessment to $37 million. Taxpayer filed an appeal with the trial court.

■ Before the trial court, the taxing authority introduced the official assessment record on the property and then rested. In response, Taxpayer presented the testimony of expert witnesses who evaluated the fair market value of the property. Teresa Hoberg, the main witness,[2] testified as to the valuation of the property by utilizing methods referenced in Section 402 of the General County Assessment Law, Act of May 22, 1933, P.L. 853, 72 P.S. § 5020–402—the cost method, the comparable sales method and the income approach.[3] By comparing recent

1. This case was reassigned to the authoring judge on February 28, 1996.

2. Reaves Lukens, Jr. testified briefly that he performed the appraisal with Hoberg and that they arrived at a fair market value of $25 million.

3. The three approaches to value are not independent of one another and, if possible, all three approaches should be utilized by an appraiser. J.D. Eaton, Real Estate Valuation in Litigation, p. 101 (1982). "The indicated value of the property by each of the approaches is then correlated

sales of similar buildings under the comparable sales method, Hoberg reached a valuation of $24 million. As for the cost approach, Hoberg testified that it was not appropriate for a building of this age, as it is usually used for new buildings.

 For the income approach, Hoberg did two computations, one based on the stabilized income approach which assumes a steady vacancy rate for projecting a one-year income stream, and the other the discounted cash flow analysis which considers a ten-year period assuming the expected loss of tenants and projected market rates for new leases on that space. In the stabilized income approach, the projected income stream, based on current contract rents in the building, provided a net operating income of $4,893,000. Hoberg then capitalized the income at a capitalization rate of 10.5 percent.[4] She also applied a tax factor of 2.78 percent,[5] or a total of 13.28 percent. The value reached through this method was $36.8 million without capital expenditures. With capital expenditures, which she explained was the amount of money which must be spent to obtain the vacancy rate assumed, whether the property is held or purchased by a new owner, Hoberg testified the valuation under this method was $25.5 million. In the discounted cash flow analysis, the net operating income before capital expenses was $4,346,000. After applying a capitalization rate of 10.5 percent[6] and a present worth factor, the valuation under the discounted cash flow analysis was $25 million. The two results were combined to reach a $25 million valuation under the income approach. Correlating the valuations of the income approach and the comparable sales method, Hoberg concluded that the fair market value was $25 million.

On cross-examination, counsel for the taxing authority asked Hoberg to apply a capitalization rate of 13.28 percent to the net operating income arrived at under the discounted cash flow analysis ($4,346,000). (R.R. 151a). Hoberg responded that she would not use that capitalization rate in that instance, but that if the calculation was done, the result would be $32.7 million. (R.R. 152a). Counsel then asked if applying that rate would violate the Uniform Standards of Professional Appraisal Practice, to which Hoberg replied affirmatively, because it would not take into consideration the declining income stream. (R.R. 152a).

 On rebuttal, the taxing authority attempted to present a city property evaluator who had not appraised the Taxpayer's property. The trial court found that because the appraiser had not appraised the property in question, he had no personal knowledge on which to base an expert opinion. Without any other evidence on rebuttal, the trial court found the fair market value to be $32.5 million. In its opinion, the court stated that it credited some of Hoberg's testimony, specifically referring to the testimony on cross-examination asking Hoberg to apply a capitalization rate of 13.28 percent to the net operating income calculated in the discounted cash flow analysis resulting in $32.7 million.

into a final estimate of value, giving consideration to the relative strengths and weaknesses of each approach in relation to the specific property under appraisal." Id.

4. The capitalization rate is the factor that converts income into present, lump-sum value. The Appraisal of Real Estate, American Institute of Real Estate Appraisers, p. 52 (8th ed. 1983). The rates or factors used for capitalization are derived by the investigation of acceptable rates of return for similar properties. Id. "In selecting a method of capitalization for application to any specific property, it is required that the assumptions built into the method of capitalization represent the actual conditions found in the property being appraised." Eaton, p. 127.

5. In the calculation of net income, no deduction was taken for real estate taxes in the expenses. (Reproduced Record 62a). Hoberg explained in her testimony that this was done so as not to skew the valuation because of the fairness or unfairness of the tax applied in a single year. (R.R. 136a).

6. No additional tax factor was used in this calculation, apparently, because in the discounted cash flow analysis, real estate taxes were deducted as projected over the ten-year period as operating expenses. (R.R. 56a).

(R.R. 152a, detailed *supra* ). Taxpayer then filed this appeal.[7]

The proceedings concerning a tax assessment case in the trial court are *de novo*. The procedure begins with the taxing authority establishing a *prima facie* case in support of its valuation simply by introducing into evidence the taxing authority's official assessment record, i.e., the property record card. *Deitch Company v. Board of Property Assessment*, 417 Pa. 213, 221, 209 A.2d 397, 402 (1965). The valuation on the property record card is presumptively valid and the burden of producing evidence of a different tax assessment value then shifts to the taxpayer. *Id.* If the taxpayer counters this official assessment record with credible, relevant evidence of its own, the taxing authority's assessment figure has served its procedural purpose and it loses the weight previously accorded to it. *Id.* The record, thereafter, may not influence the trial court's determination of the assessment's correctness and the taxpayer's burden of persuading the trial court is not increased by the presence of the record in evidence. *Id.* (citing *In re Kemble's Estate*, 280 Pa. 441, 447, 124 A. 694, 696 (1924)).

The trial court's finding of the proper valuation is also restricted by the Supreme Court in *Deitch Company*, 417 Pa. at 221–222, 209 A.2d at 402:

If the taxpayer fails to respond [to the assessment record] with credible, relevant evidence, then the taxing body prevails....

Of course, the taxing authority always has the right to rebut the owner's evidence and in such a case the weight to be given to all the evidence is always for the court to determine. The taxing authority cannot, however, rely solely on its assessment record in the face of countervailing evidence unless it is willing to run the risk of having the owner's proof believed by the court. *Where the taxpayer's testimony is relevant, credible and unrebutted, it must be given due weight and cannot be ignored by the court. It must necessarily be ac-*

cepted. (Citations omitted and emphasis added).

*See also McKnight Shopping Center v. Board of Property Assessment*, 417 Pa. 234, 242, 209 A.2d 389, 393 (1965); *Birdsall v. Carbon County Board of Assessment*, 168 Pa.Cmwlth. 266, 649 A.2d 740, 741 (1994). The trial court's mandate to accept unrebutted expert testimony from the taxpayer is also supported by the Supreme Court's decision in *Appeal of Rieck Ice Cream Company*, 417 Pa. 249, 209 A.2d 383, 386 (1965):

[Taxpayer] produced evidence of value by means of expert appraisers who recited the factors considered by them and the values arrived at therefrom. Absent lack of a witness' qualifications, such evidence by means of expert testimony is certainly competent. Its credibility and weight is for the trier of facts to determine; *but in the absence of rebuttal testimony, competent evidence from a credible witness cannot be disregarded.* (Emphasis added).

The Supreme Court has also stated:

In tax assessments, as elsewhere, the best evidence available must govern. On the record here presented, the best, and in fact only, evidence of market value, is that of appellant's witnesses, and, under these circumstances, the evidence being worthy of credit, it should have been accepted....

[W]here, as here, the evidence before the court as to market value is ample and all in conflict with the board's valuation, *the court, in the absence of other such evidence, must revalue the property according to the market value established.* In tax cases, like all others, courts must be guided by the evidence in determining what are proper valuations.

*Kemble's Estate*, 280 Pa. at 446, 124 A. at 696 (citation omitted and emphasis added). It is not the function of the trial court to independently value the property but to arrive at a valuation based on competent expert testimony. *County of Monroe v. Bolus*, 149 Pa. Cmwlth. 458, 613 A.2d 178, 181 (1992).

---

7. Our scope of review in a tax assessment appeal is limited to whether the findings of the trial court below are supported by substantial evidence or whether there exists an abuse of discre-

tion. *Appeal of Chartiers Valley School District*, 67 Pa.Cmwlth. 121, 447 A.2d 317 (1982), *appeal dismissed*, 500 Pa. 341, 456 A.2d 986 (1983).

 A trial court in tax assessment cases has the option of not finding the taxpayer's expert witness credible and relying on the taxing authority's original assessment.[8] But a trial court does not have the option of determining that the witness was credible and then picking and choosing among the numbers discussed during her testimony to set a new valuation. Here, the trial court found Hoberg's testimony to be competent and relevant and that she was a credible witness; however, it did not accept her expert valuation of the property, instead, erroneously adopting one number from part of one method of determining fair market value.

 If the expert witness is credible, then the unrebutted evidence of valuation given by the witness must be accepted by the trial court. *Deitch; Rieck Ice Cream Company.* It is the expert's valuation that the trial court must accept not just a piece of her testimony. This is particularly true here because the expert was merely doing a mechanical calculation as requested by counsel on cross-examination, and she stated that it would be an improper calculation on which to base an opinion of value.[9]

 While the trial court is the factfinder and arbiter of credibility in tax assessment cases, *see Appeal of Duquesne Club,* 92 Pa.Cmwlth. 15, 498 A.2d 459 (1985), the procedure mandated by *Deitch, Rieck Ice Cream Company* and *Kemble's Estate,* where the taxpayer's evidence is unrebutted, requires the trial court to determine whether the expert witness on valuation is credible and, if so, that witness' valuation must be accepted.[10] This is so because a valuation must be based on competent, credible testimony, and if the only such testimony is by taxpayer's

expert, her valuation must be adopted. *Kemble's Estate; see also Board of Revision of Taxes v. Markowitz,* 208 Pa.Superior Ct. 22, 220 A.2d 404 (1966) (holding the exact value determined by the expert must be accepted). Unlike cases where the taxing authority has presented rebuttal evidence, the trial court erred in attempting to "split the difference" in this case and, in effect, did its own appraisal of the property. Because Hoberg's testimony was the only competent, credible and unrebutted evidence of valuation, Taxpayer's valuation of $25 million must be accepted. Accordingly, the order of the trial court is reversed and the case is remanded for an appropriate order accepting Taxpayer's valuation.

### ORDER

AND NOW, this 18th day of April, 1996, the order of the Court of Common Pleas of Philadelphia County, dated June 6, 1994, No. 9402–0042, is reversed and the case is remanded for an appropriate order setting the fair market value of the property at issue at $25 million based on the valuation presented by 841 Associates.

Jurisdiction relinquished.

NARICK, Senior Judge, dissenting.

I respectfully dissent. The majority opinion completely misapplies case precedents and is in direct contravention to all established doctrine concerning the role of a trial court and the reviewing authority of an appellate court. This case involves the role of a trial court and its authority to determine a witness's credibility and the weight of the evidence. What the majority does is to strip the trial court of its ability to determine issues of credibility, in direct violation of

---

8. *Appeal of M.W. Kellogg Company,* 89 Pa. Cmwlth. 320, 492 A.2d 130 (1985) (trial court rejected the entire testimony of the taxpayer's witnesses because of substantial differences between their testimony to the court and to the board of tax revisions).

9. Hoberg's testimony was that the 13.28 percent capitalization rate was inapplicable to the net operating income for the discounted cash flow analysis. Her prior testimony established that the 13.28 percent rate included a tax rate, but that taxes were already calculated in the net

operating income in the discounted cash flow calculation. Hoberg also stated that she believed the calculation arriving at the $3.2 million valuation would be in violation of the Uniform Standards of Professional Appraisal Practice. (R.R. 152a).

10. If the expert witness gave an entirely new valuation on cross-examination, then the valuation on either direct or cross-examination could be credited and accepted by the trial court without accepting the contradictory valuation. However, that is not the case here.

voluminous case law affording the trial court the sole power to decide these matters.

As discussed by the majority, this case involves a tax appeal by 841 Associates (Appellant) concerning the fair market value of Appellant's fourteen story Center City office tower located in Center City Philadelphia. At the de novo hearing on June 6, 1994, the Taxing Authority asserted that the fair market value of the property was valued at $43.2 million, but after the appeal was filed, it was reduced to $37 million. Appellant claimed that the fair market value was $25 million. Following a de novo hearing on June 6, 1994, the trial court determined that the fair market value of Appellant's property for 1994 was $32.5 million. Thereafter, on April 11, 1995, the trial court issued an opinion explaining its aforementioned June 6, 1994 order. The trial court posited that it made a credibility determination involving Appellant's expert witness, Theresa Hoberg (Hoberg), and accepted **only part of her testimony as being credible.** In doing so, the trial court referenced Pennsylvania Standard Practice 2d, § 555:14 (1982) and stated: "It is well settled that the court is free to accept or reject, in whole or in part, the opinion of **any** expert." [1]

The majority ignores the significance of the trial court's credibility determination concerning Hoberg. The trial court did not find Hoberg to be credible, only partially credible, thereby ruling that part of her testimony was unbelievable. This duty, credibility determination, remains entirely within the realm of the trial court and should not and cannot be addressed by an appellate court, as the majority has done.

The majority relies upon *Deitch Co. v. Board of Property Assessment,* 417 Pa. 213, 209 A.2d 397 (1965), which states in pertinent part: "Where the taxpayer's testimony is relevant, credible and unrebutted, it must be given due weight and cannot be ignored by the court. It must necessarily be accepted." The majority's application of this case and the aforementioned language, in order to support its reversal of the trial court's credibility determination of Hoberg, is completely puzzling. Our Supreme Court in *Deitch* stat-

ed that a trial court must accept a taxpayer's testimony where that testimony is **relevant, credible and unrebutted.** The trial court, however, in this case, was not required to accept the taxpayer's testimony as the trial court did not find Hoberg's witness to be entirely credible. *Deitch* supports the proposition that only in cases where testimony is found credible, is a trial court bound to accept it.

The majority states at page six: "The trial court's mandate to accept unrebutted expert testimony from the taxpayer is also supported by the Supreme Court's decision in *Appeal of Rieck Ice Cream Co.,* 417 Pa. 249, 209 A.2d 383 (1965)." In *Rieck,* the Court stated that in the absence of rebuttable testimony, competent evidence from a **credible witness** cannot be disregarded. Our Supreme Court mandates a trial court to accept a witness's testimony where that evidence is found to be **credible.** However, the trial court did not find Hoberg to be credible and this Court is mandated to accept the credibility determination of the trial court. The majority's refusal to acknowledge the trial court's determination concerning Hoberg's credibility blatantly violates clear precedent from our Supreme Court.

This Court has repeatedly ruled that the trial court, as a factfinder in a tax assessment case, is the sole arbiter of the evidence and as such is empowered to decide the weight to be accorded to all testimony presented. *Appeal of Duquesne Club,* 92 Pa. Cmwlth. 15, 498 A.2d 459 (1985). *See also Pittsburgh–Des Moines Steel Co., Inc. v. McLaughlin,* 77 Pa.Cmwlth. 565, 466 A.2d 1092 (1983). As all matters of credibility and evidentiary weight are within the province of the trial court, these determinations are therefore binding on this Court absent an error of law. *Walnut–Twelve Assoc. v. Board of Revision of Taxes of City of Philadelphia,* 131 Pa.Cmwlth. 404, 570 A.2d 619 (1990). *See also B.P. Oil Co., Inc. v. Delaware County Board of Assessment Appeals,* 114 Pa.Cmwlth. 549, 539 A.2d 473 (1988) and *Lycoming County Appeal,* 100 Pa.Cmwlth. 616, 515 A.2d 335 (1986). It is not the func-

1. In pertinent part from the trial court's April 11, 1995 opinion.

tion of this Court to re-weigh the evidence and to substitute its judgment for that of the trial court.

In this case, the trial court made a credibility determination and decided to only partially believe the testimony presented by Appellant's expert witness. In doing so, the trial court referenced the Appellant's expert witness's assertion that, based upon a different computation method, the value for Appellant's property would be $32.7 million for the year 1994.[2]

The majority opinion, and not the trial court, asserts that Appellant's expert witness was credible in all respects, particularly since Appellant's witness was the only witness to testify and that the Taxing Authority failed to present any rebuttal evidence. Unfortunately, the majority opinion, however, fails to note that in the transcript of the hearing the expert's witness' testimony consisted of approximately twenty-three pages, whereas the Taxing Authority's solicitor's extensive cross-examination of the expert's witness consisted of sixteen pages. On cross-examination, the witness expressed uncertainty in various areas including the application of cost value, irrelevance of improvements, rental rates in projecting the value, the application of the Uniformed Standards of Professional Appraisal Practice, which does not dictate the fair market value, market conditions, relevance of assumptions and estimates in the future based on the witness's assumptions, rentable area and the cost thereof.

Typically, it is clear, as in all tax assessment cases that come before a trial court, that determining the fair market value is not an exact science, but rather requires the trial court to make a judgment call in rendering an opinion based on competent, relevant and credible evidence of what is the fair market value. The trial court in this case made a judgment call in which he determined, based on the various positions taken by the parties, and Hoberg's testimony, that the fair market value was $32.5 million.

The majority, on page eight, states: "But a trial court does not have the option of determining that the witness was credible and then picking and choosing among the numbers discussed during her testimony to set a valuation." Not only does the majority fail to support this apparent rule of law with any statutory or precedential authority, the majority also has not thoroughly or adequately reviewed the record below or the trial court's opinion. As previously discussed, the majority has somehow disregarded the fact that the trial court made a credibility determination finding Hoberg's testimony not entirely credible. As a result, this Court should uphold the trial court's credibility determination and affirm its decision assigning Appellant's property a fair market value for 1994 of $32.5 million.

Accordingly, I would affirm the trial court's decision.

2. Appellant's expert witness, Theresa Hoberg, testified in pertinent part:

A. Our projection for the net operating income for 1994 before capital expenses was $4,346,000.

Q. And if you capitalize that, if you divide that by the cap rate, what will you get? What value will be adduced by doing that—will result from that?

A. It depends upon what capitalization rate you use.

Q. Using your own cap rate.

A. I would use a different capitalization rate on that.

Q. Would you use 13%?

A. 13% is a 10½% capitalization rate plus a 2.78% tax factor.

Q. What I want you to do is to capitalize the 4,346,000 net operating income that you arrived at under the discounted cash flow with the cap rate that you used in the report, which I take to be 13.28. What value do you then get?

A. That indicates a number of $32,700,000.

Notes of Testimony of June 6, 1994 hearing at 38–39.