**James R. HERZOG and Scott B. Herzog, Appellants**

v.

**McKEAN COUNTY BOARD OF ASSESSMENT APPEALS.**

Commonwealth Court of Pennsylvania.

Argued Sept. 14, 2010.
Decided Feb. 22, 2011.

Jarett R. Smith, Coudersport, for appellants.

Bert M. Goodman, Wayne, for appellee.

BEFORE: COHN JUBELIRER, Judge, and LEAVITT, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge LEAVITT.

James Herzog and Scott Herzog[1] appeal an order of the Court of Common Pleas of McKean County (trial court) denying their appeals of the McKean County Board of Assessment's (Board) property tax assessments for two parcels of forested property. The tax assessments were preferential assessments authorized by the Pennsylvania Farmland and Forest Land Assessment Act of 1974, commonly known as the Clean and Green Act.[2] Finding no error in the County's preferential tax assessments of the Herzogs' property, we affirm the trial court.

The Herzogs' property consists of two parcels of land in McKean County, totaling 1,021.91 acres, which are classified as forest reserves under the Clean and Green Act. As forest reserve land, the Herzogs' property qualified for a reduced tax assessment. The Herzogs challenge their preferential tax assessments for the 2000 and 2002 tax years.[3]

█ The Clean and Green Act establishes the methodology for calculating preferential tax assessments. It requires that a county assessor first establish a "use value" for forest land.[4] Section 4.2(b) of the Clean and Green Act states:

1. The original landowner at the time of the 2000 appeal was James Herzog. His successors in interest are his sons, Scott and Kent Herzog, who brought the 2002 appeal.

2. Act of December 19, 1974, P.L. 973, *as amended*, 72 P.S. §§ 5490.1—5490.13.

3. The outcome of the instant appeal will affect the assessments for the Herzogs' property for every tax year from 2000 to the present. *See* Section 704 of The Fourth to Eighth Class and Selective County Assessment Law, Act of May 21, 1943, P.L. 571, *as amended*, 72 P.S. § 5453.704(f).

4. Although not defined in the Clean and Green Act, "use value" represents value to a specific user; it is premised on the productivity of the good in question and may vary depending on the current conditions in the marketplace. *See F & M Schaeffer Brewing Co. v. Lehigh County Board of Appeals*, 530 Pa. 451, 457, 610 A.2d 1, 3 (1992). *See also* BLACK'S LAW DICTIONARY 1692 (9th ed. 2009) (defining "use value" as a value established by the utility of an object, not its sale or exchange value).

For each application for preferential assessment, the county assessor shall establish a total use value for land in forest reserve by considering available evidence of capability of the land for its particular use. Contributory value of farm buildings shall be used.

72 P.S. § 5490.4b(b).[5] When establishing the "use value" of forest reserve land, the assessor may use the "use values" established by the Pennsylvania Department of Agriculture, in conjunction with the Bureau of Forestry of the Department of Conservation and Natural Resources (Commonwealth), for each county in Pennsylvania. 7 Pa.Code § 137b.51.[6] Alternatively, Section 4.2 of the Clean and Green Act authorizes the county assessor to establish his own use value for forest land in his county, so long as that use value is lower than the Commonwealth's use value. 72 P.S. § 5490.4b(c).[7] Next, the assessor calculates the preferential tax assessment by multiplying the total acres of land, for each land use subcategory, i.e. agricultural land or forest reserve, by the use value for that subcategory. 7 Pa.Code § 137b.51(d). For example, for a 100 acre parcel that is 70 percent farmland and 30 percent forest reserve, the county assessor would apply the agricultural use value to 70 acres and the forest reserve use value to 30 acres to generate the preferential tax assessment for the entire parcel. Finally, the preferential tax assessment for a parcel is multiplied by the county's predetermined ratio to calculate an individual property's tax liability. *Id.*

Here, the McKean County Assessor used the Commonwealth's use values for forest reserve property in McKean County to calculate the Herzogs' preferential assessments.[8] The Commonwealth's use value, established for all forest reserve land in McKean County, was $186 per acre in

---

5. Section 4.2 was added by the Act of December 21, 1998, P.L. 1225.

6. In relevant part, it states:
   (a) Use values and land use subcategories to be provided by the Department. The Department will determine the land use subcategories and provide county assessors use values for each land use subcategory. The Department will provide these land use subcategories and use values to each county assessor by May 1 of each year.
   
   \*     \*     \*
   
   (d) Determining preferential assessment. The preferential assessment of land is determined by multiplying the number of acres in each land use subcategory by the use value for that particular land use subcategory, adding these products and multiplying the total by the county's established predetermined ratio....
   
   \*     \*     \*
   
   (e) Option of county assessors to establish and use lower use values. A county assessor may establish use values for land use subcategories that are less than the use values established by the Department for those same land use subcategories. A county assessor may use these lower use values in determining preferential assessments under the act. Regardless of whether the county assessor applies use values established by the Department or lower use values established by the county assessor, the county assessor shall apply the use values uniformly when calculating or recalculating preferential assessments, and shall apply these use values to the same land use subcategories as established by the Department....
   
   7 Pa.Code § 137b.51(a), (d) and (e) (emphasis omitted).

7. It states:
   A county assessor may establish use values which are less than the values provided by the department under section 4.1, but lesser values shall be applied uniformly to all land in the county eligible for preferential assessment.
   
   72 P.S. § 5490.4b(c).

8. The County applied the use values provided by the Commonwealth from 2000 to 2003. Beginning in 2004, the County set use values that were lower than those established by the Commonwealth.

2000 and $244 per acre in 2002. For the Herzogs' combined parcels, this resulted in a preferential tax assessment of $60,820 in 2000 and $187,440 in 2002. After applying the County's predetermined ratio, the County generated a real estate tax of the Herzog's parcel in the amount of $10,563 in 2000 and $46,863 in 2002.

The Herzogs appealed their preferential tax assessments as too high, and the Board denied their appeal. The Herzogs then appealed to the trial court contending, *inter alia*, that the Commonwealth's use values were improper, excessive, and not in accordance with the mandates of the Clean and Green Act. The Herzogs did not challenge any other aspect of the County's assessment methodology.

At the hearing, the Board called Angela Tennies, Chief Assessor of McKean County, who testified about the County's assessment of the Herzogs' property from 1998 through 2009. The Board also introduced the relevant County assessment records into evidence. Having established its *prima facie* case for the validity of the assessments, the Board rested its case.

In rebuttal, the Herzogs called David Lombardo, an expert in forest management, to testify about the value of the timber on their land and about timber management practices. Lombardo testified that he regularly appraises timber values. On August 10, 2007, he prepared a "Forest Type Evaluation Report" on the Herzogs' property, which considered the type of timber, the rotation cycle, and average annual management costs. Lombardo's report valued the timber, by type of tree, from 2000 to 2004.[9]

Lombardo explained that, as with any commodity, timber values fluctuate. For example, the total value, per acre, of northern hardwoods was $1,900.20 in the year 2000, but then fell to $1,583.50 in 2001. Because of these price fluctuations, Lombardo opined that an annual net income methodology should not be used to value a forested property the size of the Herzogs' property. When asked about the normal percentage capitalization rate for timber investment, Lombardo stated that he would refer that question to the Board's expert, Dr. Marc McDill. Lombardo did not offer a use value for the Herzogs' parcels for the years in question.

The Herzogs next called Wesley Zapel, an accountant, to testify about an appropriate use value for their property. Zapel testified that use values should be calculated using a discounted future cash flow method, rather than an income capitalization approach. Zapel admitted that he had no experience with the Clean and Green Act or in calculating the value of forested land, but he explained that he was conversant with the income capitalization and the discounted future cash flow methods of valuation. According to Zapel, the discounted future cash flow method is better suited for businesses that do not have an annual income stream, such as forestry. Zapel opined that it was inappropriate to the income capitalization approach to develop a use value for land in forest reserves.

Zapel acknowledged that because his recommended discounted cash flow method assumes a 90–year rotation period, it yields a very low land value at the beginning of the rotation period. Indeed, in some years the forest land would have no value or a negative value. Recognizing that it would be unrealistic to expect a county to forgive all taxes or to have the

---

9. Lombardo used projected yields taken from a book co-authored by the Board's expert, Dr. Marc McDill. Because Lombardo did not address the use value of the land for purposes of the Clean and Green Act in his report, we need not delve into the figures he proposed.

county pay taxes to owners of forest land, Zapel reduced the assumed 90–year rotation to a 22–year, six month rotation period. Zapel's discounted future cash flow methodology yielded use values of $10 per acre in 2000 and $22 per acre in 2003 for the Herzogs' property. These use values were proposed to apply only to the Herzogs' parcel; the assessed values of other forested parcels in McKean County would vary, depending upon the age and type of timber grown on those parcels. Zapel opined that his discounted cash flow methodology yielded a true use value of forested land.[10]

In response, the Board presented the testimony of Marc McDill, Ph.D., who teaches Forest Economics at Pennsylvania State University. McDill explained that he works with the Bureau of Forestry to calculate use values, which are then provided to the Department of Agriculture. McDill testified about how use values are calculated, and he pointed out flaws in Zapel's methodology.

McDill disagreed with Zapel's proposed methodology, noting that it required increasing the value of the land as the timber matured. This increase has the untoward consequence of creating "a strong incentive for forest landowners to cut their timber prematurely." Reproduced Record, Part II, Notes of Testimony at 55 (R.R., Part ___, N.T. at ___). Thus, the methodology encourages the exact opposite of what was intended by the legislature, i.e., preservation of forested land.

McDill opined that the proper approach to valuation requires using an average annual income, i.e., the income capitalization approach. McDill conceded the flaws in the income capitalization approach, but he rejected Zapel's methodology because "it's based on just the value of the land at the beginning of the cutting cycle ... so it doesn't include the value of the timber at all." R.R., Part II, N.T. at 86. McDill noted that rarely does an entire parcel of land contain timber that is all the same age, as would have to be the case in order for Zapel's methodology to work. McDill also observed that Zapel's methodology would relieve landowners of any tax obligation when timber was young and then subject them to a very high tax when the timber was mature and ready for harvesting. Pointing out that Zapel adjusted the figures in order to get more palpable results, McDill dismissed these adjustments as "cook[ing] the books to make his formulas come up with a reasonable number." R.R., Part II, N.T. at 87.

McDill described how the Commonwealth calculates use values for land in forest reserves under the Clean and Green Act. First, the Commonwealth looks at average timber yields, i.e., amount of timber harvested, which rarely change from year to year. Next, the Commonwealth looks at the sale prices for six different categories of timber throughout Pennsylvania. R.R., Part II, N.T. at 46. This data is collected for four "regions" of the Commonwealth: Northeast, Northwest, Southeast and Southwest; and for six categories of timber: Softwoods, Select Oak, Oak, Northern Hardwoods, Black Cherry, and Miscellaneous Hardwoods.[11] These data are inputted to the income capitalization formula. After adjusting the formula

10. Although Zapel initially testified that his recommended use values were not rendered within a reasonable degree of certainty, he later stated that they were. Even so, Zapel admitted that his opinion was not an exact determination of use value, stating instead that he was offering the values for purposes of illustration.

11. This data is collected from over 3,000 plots of public land throughout Pennsylvania. R.R., Part II, N.T. at 47.

for the inclusion of each county's tax load factor,[12] the Commonwealth calculates the forest reserve use values for the six different timber classifications for each county. Those timber classifications are averaged to create a single use value for all land in forest reserve for each county. Thus, the Commonwealth's use value represents the average use value for land in forest reserve, based upon the general composition of timber species in forests of that specific county.[13]

Finally, McDill explained why the income capitalization approach is used to calculate use values under the Clean and Green Act even though some forest reserves do not generate annual income.[14] McDill explained that the Commonwealth's use values represent average values, for the timber industry as a whole, in Pennsylvania. This provides stability from year-to-year regardless of the maturity of the timber or the amount harvested. This negates the possibility of having a "negative" tax assessment of land where the timber is young and a very high assessment when the timber is mature. Further, the income capitalization methodology advances the purpose of the Clean and Green Act, which is to protect forested land from being harvested prematurely.

■ The trial court credited McDill's testimony and found it more persuasive than that offered by the Herzogs' witnesses. The trial court observed that Lombardo did not even offer a different use value of the parcel for the years in question. The trial court did not find Zapel persuasive, given his admission that he lacked experience in calculating use values under the Clean and Green Act. The court also rejected Zapel's methodology because it did not yield figures within a "reasonable degree of certainty" and was based upon assumptions that had no basis in the record. Trial Court Opinion at 4, Findings of Fact 9–10. The trial court denied the appeal, holding that the Herzogs did not produce evidence sufficient to show that the Board's assessments were erroneous. The Herzogs now appeal to this Court.[15]

On appeal, the Herzogs raise four issues, which we condense and reorder for clarity. First, the Herzogs argue that the trial court erred by not accepting the testimony of their witnesses. Second, the Herzogs argue that the trial court failed to understand and properly apply the Clean and Green Act.

■ In their first argument, the Herzogs contend that the trial court erred in not crediting their witnesses. Specifically,

---

12. A county's tax load factor represents the millage rates for a county and all the townships and school districts in that county.

13. County assessors can, theoretically, apply the specific timber subcategory use values if they so choose rather than the weighted average use value. *See* Certified Record, Respondent's Exhibit 4. However, practically, this would be difficult because the county assessor would have to calculate the total acreage of each timber subcategory for every parcel of land. This number would likely change every year due to harvest or forest management. Accordingly, the county assessor would have to re-calculate the acreage breakdowns for every parcel of forest reserve land every year.

14. McDill conceded that a parcel the size of that owned by the Herzogs, *i.e.*, approximately 1,000 acres, does not generate annual income. On the other hand, larger parcels of land where some timber is harvested each year will generate annual income.

15. Our review in tax assessment matters is limited to determining whether the trial court abused its discretion, committed an error of law, or reached a conclusion not supported by substantial evidence. *Way v. Berks County Board of Assessment*, 990 A.2d 1191, 1194 n. 4 (Pa.Cmwlth.2010).

the Herzogs argue that Zapel's opinion should have been accepted by the trial court because his testimony was uncontradicted. Moreover, the Herzogs argue that their Exhibits 9 and 10 impeached McDill's testimony. We disagree.

In a *de novo* proceeding in a tax assessment case, the taxing authority bears the initial burden of establishing its *prima facie* case for the validity of the assessment. *Deitch Co. v. Board of Property Assessment, Appeals and Review of Allegheny County,* 417 Pa. 213, 221, 209 A.2d 397, 402 (1965). This is typically done by presenting the official assessment records and the testimony of an assessment officer. The burden then shifts to the taxpayer to respond with *credible, relevant* evidence to persuade the court of the merits of his position. *Id.* (emphasis added). If the taxpayer fails to do so, then the taxing authority prevails. If the taxpayer meets his burden, then the court may no longer presume the taxing authority's assessments are correct. *Id.* at 221–22, 209 A.2d at 402.

The trial court's findings of fact can be reversed only for clear error. *Green v. Schuylkill County Board of Assessment Appeals,* 565 Pa. 185, 196–97, 772 A.2d 419, 427 (2001). In making its findings, the trial court must state the basis and reasons for its decisions, regardless of whether one expert or multiple experts testify. *Id.* at 208, 772 A.2d at 433.

Where the trial court's conclusions are supported by substantial evidence in the record, this Court may not disturb those findings on appeal. *Earl Township v. Reading Broadcasting, Inc.* 770 A.2d 794, 798 (Pa.Cmwlth.2001). When expert testimony conflicts, as it did here, the trial court must determine the weight and credibility to assign each expert's testimony. *Pennypack Woods Home Ownership Association v. Board of Revision of Taxes,* 163 Pa.Cmwlth. 80, 639 A.2d 1302, 1306 (1994).

In this case, the trial court rejected Zapel's testimony as not credible or persuasive and explained its reasons for doing so. Specifically, the trial court explained that Zapel lacked experience in calculating use values under the Clean and Green Act; Zapel's proposed use values relied on assumptions that had no basis in the record; and Zapel could not conclusively state that his proposed use values were accurate within a reasonable degree of certainty. Trial Court Opinion at 4, Findings of Fact 9–10. Conversely, the Court explicitly found McDill's methodology was consistent with what is required by the Clean and Green Act and, therefore, his testimony was found credible and persuasive. Trial Court Opinion at 4, Findings of Fact 13.

However, the Herzogs contend that McDill did not successfully rebut their evidence. They argue that Exhibits 9 and 10, which consist of documents authored or co-authored by McDill, impeached McDill's testimony.[16] Specifically, they claim that

---

16. Exhibit 9 was an article co-authored by McDill that criticized the current methodology for establishing use values for forest land, noting, *inter alia,* that a policy argument could be made that forest land should not be taxed as real property at all but instead should be subjected to a yield, or income tax. However, this article also observed that such a change would require legislative change. Further, other methodologies did not fit the intent of the Clean and Green Act to preserve forest land because they would incentivize premature harvesting of timber. R.R., Part II, N.T. at 79–92. Exhibit 10 was an expert report used as evidence in another McKean County tax case. The report criticized the pre–1998 methodology used by the Commonwealth to develop a use value for forest land in a given county. After that report, the Commonwealth refined its methodology to make it more representative of forest land values in different areas of Pennsylvania, as the report urged. Neither writing directly contradicts

McDill made "statements confirming forests do not generate annual net income." Herzog Brief at 30. However, this was never a point in dispute. McDill testified about "how the Commonwealth arrived at the Clean and Green [use] values" and opined on why an annual income approach is the best method to use, given the alternatives. *See* Trial Court Opinion at 4. McDill specifically explained why the income capitalization approach must be used to establish use values for forest land, even though not all parcels of forest land generate annual income. The Herzogs' attacks on McDill's credibility miss the mark.

In sum, we conclude that the trial court gave adequate reasons for rejecting Zapel's testimony and accepting McDill's testimony. Further, its findings of fact were based upon substantial evidence. Therefore, the trial court did not err in this regard.

■ Next, the Herzogs argue that the trial court failed to understand and properly apply the Clean and Green Act. Because county assessors are not required to use the Commonwealth's use values, the Herzogs argue that county assessors must select the most appropriate use value and then justify that selection.[17] The county assessors may not, according to the Herzogs, "blindly accept" the Commonwealth's use values. Further, they argue that it is never appropriate to use an income capi-

talization approach to establish the use value of forest land, such as their parcel, that does not generate annual income. The Herzogs argue that an appropriate use value is one that accurately reflects the current value of the timber being grown on a particular parcel.[18] Stated otherwise, the Herzogs contend that the use values established by the Commonwealth are wrong, and the county assessors erred in using them.

■ Our Supreme Court has recognized that "[t]axation is a practical, and not a scientific problem[, and] [d]etermining the [value] of a property, therefore, is often not a matter of exact science or capable of mathematical accuracy." *Green*, 565 Pa. at 205, 772 A.2d at 432 (citation omitted). It has also held that the Uniformity Clause of the Pennsylvania Constitution requires all property in a class to be entitled to uniform treatment throughout the taxing jurisdiction. *See Deitch*, 417 Pa. at 218, 209 A.2d at 400. Finally, a statute creating a preferential tax treatment must be construed narrowly and against taxpayers. *Feick v. Berks County Board of Assessment Appeals*, 720 A.2d 504, 506 n. 4 (Pa.Cmwlth.1998). With these principles in mind, we turn to the Herzogs' arguments that county assessors must justify their use of the Commonwealth's use values and that the income capitalization ap-

---

McDill's expert testimony and analysis in this case.

17. The Herzogs try to support this assertion by arguing that Section 602 of The Fourth to Eighth Class and Selective County Assessment Law requires the county assessor to rate and value all subjects of local taxation. *See* Section 602 of The Fourth to Eighth Class and Selective County Assessment Law, Act of May 21, 1943, P.L. 571, *as amended*, 72 P.S. § 5453.602. However, The Fourth to Eighth Class and Selective County Assessment Law is a general tax statute and the Clean and Green

Act is a specific statute dealing with the taxation of forest reserves. Thus, the Clean and Green Act controls, and the Herzogs' argument lacks merit.

18. The Herzogs argue that forests do not generate net annual income, and it cannot be approximated by using average yields and average income. If taken literally, this argument means that forested real property could not be taxed until, and unless, timber is harvested; thus, the real property tax would be replaced by an income tax.

proach cannot be used to calculate use values under the Clean and Green Act.

We begin with a review of the relevant provisions of the Clean and Green Act. In relevant part, Section 4.1 states:

> (a) ... the department shall establish and provide to all county assessors county-specific use values for land in agricultural use and agricultural reserve in accordance with this section.
>
> (b) When establishing county-specific use values for land in agricultural use and agricultural reserve the department ... shall use the income approach for asset valuation.[19]
>
> (c) ... the department shall establish and provide to all county assessors use values for land in forest reserve.

72 P.S. § 5490.4a.[20] Section 4.1 directs that the income approach is the exclusive methodology to be used when fixing use values for agricultural land. By contrast, the legislature did not specify how use values for forest land were to be calculated. It did not, however, prohibit the income approach. The only requirement under Section 4.1 is that the Department of Agriculture consult the Bureau of Forestry of the Department of Conservation and Natural Resources when establishing use values. 72 P.S. § 5490.4a(c).

The duties of county assessors establishing preferential assessments for forest reserve land under the Clean and Green Act are clear. Section 4.2 provides, in relevant part, that:

> (b) For each application for preferential assessment, the county assessor shall establish a total use value for land in forest reserve by considering available evidence of *capability of the land* for its particular use. Contributory value of farm buildings *shall be used.*
>
> (c) A county assessor may establish use values which are less than the values provided by the department ..., but lesser values *shall be applied uniformly to all land* in the county eligible for preferential assessment.

72 P.S. § 5490.4b (emphasis added).[21] In short, Section 4.2 directs county assessors to consider the capability of the land for its particular use, and it authorizes county assessors to establish a use value other than that established by the Commonwealth, so long as it is lower. 72 P.S. § 5490.4b. However, the lower use value must be a single, per-acre number that applies to all forest land in the county.

---

19. In 1998, Section 2 of the Clean and Green Act was amended to include the definitions of various financial terms. Now Section 2 defines the income approach as:

> The method of valuation which uses a capitalization rate to convert annual net income to an estimate of present value. Present value is equal to the net annual return to land divided by the capitalization rate.

72 P.S. § 5490.2.

20. Section 4.1 was added by the Act of December 21, 1998, P.L. 1225.

21. Prior to the 1998 amendments to the Clean and Green Act, the Act did not contain detailed instructions on how to calculate use values or preferential assessments. As originally enacted the only requirements, contained in Section 3(b) of the original Clean and Green Act, provided:

> The assessor when determining the value of land in agricultural use, agricultural reserve use, or forest reserve use, shall, in arriving at the value of such land for its particular use, consider available evidence of such lands' capability for its particular use as derived from the soil survey at the Pennsylvania State University, the National Cooperative Soil Survey, the United States Census of Agricultural Categories of land use classes, and evidence of the capability of the land devoted to such use.

Former Section 3(b) of the Act of December 19, 1974, P.L. 973, No. 319, 72 P.S. § 5490.3(b).

Both the Clean and Green Act and the regulation in Title 7 of the Pennsylvania Code state the duties of county assessors in the permissive. They each provide that county assessors *may* establish lower use values if they so choose, but they do not mandate their establishment. Moreover, neither the Clean and Green Act nor Title 7 burden a county assessor with the obligation to justify their adoption of the use values provided by the Commonwealth.

The Herzogs, with their narrow focus on trying to require the use of a methodology that will result in lower use values and lower preferential assessments, quite literally lose sight of the forest for the trees. Their arguments are flawed.

First, the Herzogs note that McDill stated that when developing an average income, the Commonwealth uses an "Olympic ten year average." It takes values from the last ten years and drops the high and low, so that an eight year average is used. *See R.R.*, Part II, N.T. at 48. The Herzogs point out that Section 2 of the Clean and Green Act requires the "capitalization rate" to be calculated using a five-year rolling average.[22] They are correct. Even so, the Herzogs cannot prevail. First, the County calculated the Herzogs' preferential tax assessments by using the use values provided to it by the Commonwealth, which is expressly allowed. Second, the Herzogs did not present persuasive evidence that their method of determining use values should be adopted in favor of the method currently used. Finally, the Herzogs did not offer any evidence or testimony as to what their assessments should have been had the

Commonwealth used the five-year rolling average, required under the Clean and Green Act, when calculating use values.

Second, county assessors do not have to justify using the Commonwealth's use values. The Herzogs claim otherwise, pointing to *Independent Oil and Gas Association of Pennsylvania v. Board of Assessment Appeals of Fayette County*, 572 Pa. 240, 814 A.2d 180 (2002). In *Independent Oil and Gas*, our Supreme Court held that a county assessor could not tax oil and gas interests because there was no Pennsylvania statute that taxed oil and gas as real estate or on an *ad valorem* basis. *Independent Oil and Gas*, 572 Pa. at 244–47, 814 A.2d at 183–84. The case had nothing to do with preferential tax assessments and plainly the Herzogs' parcel is real estate subject to taxation. The Clean and Green Act expressly authorizes county assessors to use the Commonwealth's use values, and it does not require them to justify that decision.

In support of their contention that the income capitalization approach can never be used to establish use values for forest reserves, the Herzogs cite to *Way v. Berks County Board of Assessment*, 990 A.2d 1191 (Pa.Cmwlth.2010). They claim that *Way* established that actual gross income must exist before an income capitalization methodology can be used. Again, this case is irrelevant.

In *Way*, a taxpayer sought a Clean and Green assessment for agricultural land that did not meet the Clean and Green Act's ten-acre minimum lot requirement. *Way*, 990 A.2d at 1192. Under the Clean

---

**22.** As it pertains to the capitalization rate, Section 2 states:

"Capitalization rate." The percentage rate used to convert income to value, as determined by the most recent five-year rolling average of fifteen-year fixed loan interest rates offered to landowners by the Federal Agricultural Mortgage Corporation or other similar Federal agricultural lending institution, adjusted to include the landowner's risk of investment and the effective tax rate. 72 P.S. § 5490.2.

and Green Act, a property that does not meet the minimum acreage can still receive preferential assessments so long as *"anticipated"* income from the sale of crops is over $2,000. *Id.* at 1194 (emphasis added). In *Way*, the taxpayer sold three of his four crops, corn, barley and soybeans, for $1,430. *Id.* at 1193. Because he did not sell the hay he grew, but used it all to feed his farm animals, this Court held that the value of the hay, approximately $700, could not be included when measuring his income.

*Way* is inapposite. First, it concerned agricultural land, not forest reserves. Second, *Way* dealt with the question of whether a taxpayer farming a parcel smaller than ten acres was entitled to preferential tax treatment under the Clean and Green Act. Here, there is no question that the Herzogs are entitled to a preferential assessment. They simply want it to be more favorable. *Way* offers no instruction on whether the income capitalization approach can be used for land in forest reserves. It does not suggest that annual sales are required even in situations where, as here, it takes longer than one year for the crop to mature and be harvested.

Third, the Herzogs' proposed method of calculating use values would likely violate the Uniformity Clause of the Pennsylvania Constitution.[23] The income capitalization approach currently employed by the Commonwealth results in a single use value for all land in forest reserve in the county. Zapel's methodology would make the uniform and countywide application of a single use value impossible. It would establish a separate "use value" for each parcel of forested land in a county, based upon the age and condition of the timber on each individual parcel of land. This would violate the statute and the regulation, which require countywide uniformity, even where the county assessor establishes his own use value rather than use the Commonwealth's use value. Section 4.2(c) of the Clean and Green Act, 72 P.S. § 5490.4a; 7 Pa.Code § 137b.51.[24]

In sum, the actions of the McKean County Assessor in this case were expressly authorized by the Clean and Green Act, which does not require county assessors to justify their decision to use the Commonwealth's use values. Therefore, the Herzogs' argument in this regard must fail. Likewise, because the income approach methodology employed by the Commonwealth to establish use values for forest land is not forbidden by the Clean and Green Act, the Herzogs' argument that it is "wrong" must fail.[25]

The income capitalization approach is neither perfect nor easily applied to forest reserves. However, it does not violate the

---

23. Article VIII, Section 1 of the Pennsylvania Constitution states:

All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws. PA. CONST. art. VIII, § 1.

24. In relevant part, 7 Pa.Code § 137b.51 requires that (1) use values determined by an assessor must be made for the same land use subcategories as those created by the Department; and (2) those use values must be applied uniformly. 7 Pa.Code § 137b.51.

25. The Herzogs' underlying belief that a landowner can challenge the use of the income approach used by the Department under the Act may be correct. However, in this case, the Herzogs did not offer a persuasive argument on why their proposed method of calculating use values for preferential assessments was more accurate and should be chosen over the existing income capitalization approach. Thus, the Herzogs did not carry their burden and cannot prevail.

specific directions of the Clean and Green Act but, rather, conforms to them. McDill testified that it is the best alternative.[26] The income capitalization methodology employed by the Commonwealth uses average timber prices and yields, which provides an incentive to the taxpayer to delay harvesting until the timber is fully matured, while ensuring a tax break to the owner of the forest reserve who keeps his land in forest.

For the above-stated reasons, we affirm the trial court.

**26.** McDill testified that the Commonwealth believes that the Clean and Green Act mandates the income capitalization methodology for establishing the use value for forest land. This is not correct. The income capitalization methodology is mandated solely for agricultural land.

### *ORDER*

AND NOW, this 22nd day of February, 2011, the order of the Court of Common Pleas of McKean County, dated September 9, 2009, in the above-captioned matter is hereby AFFIRMED.